DECISION
 IN MANDAMUS {¶ 1} Relator, Dennis Matheny, has filed an original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio, to vacate its order denying him permanent total disability compensation, and to enter an order granting such compensation. *Page 2 
 {¶ 2} This matter was referred to a magistrate of this court pursuant to Civ. R. 53(C) and Loc. R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.) No objections have been filed to that decision.
 {¶ 3} Finding no error of law or other defect on the face of the magistrate's decision, this court adopts the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's recommendation, relator's requested writ of mandamus is denied. *Page 3 
 APPENDIX A {¶ 4} In this original action, relator, Dennis Matheny, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
 Findings of Fact: *Page 4 
 {¶ 5} 1. On August 23, 2000, relator sustained an industrial injury while employed as a head custodian for respondent Fairfield City Schools. On his application for workers' compensation benefits, relator described the incident that caused his injury: "Stepped out of car and left foot slipped on wet pavement. Grabbed door to break my fall."
 {¶ 6} 2. The industrial claim (No. 00-491833) is allowed for "sprain lumbosacral; aggravation of pre-existing herniated discs at L4-5 and L5-S1; aggravation of pre-existing spinal stenosis at L4-5; depressive psychosis — moderate."
 {¶ 7} 3. On September 27, 2006, relator filed an application for PTD compensation.
 {¶ 8} Under the "Education" section of the application, relator indicated that the tenth grade was the highest grade of school he has completed and this occurred in 1963.
 {¶ 9} He ended his schooling "[t]o go to work," but later obtained a certificate for passing the General Educational Development ("GED") test.
 {¶ 10} He also attended a "[f]oundry maintenance apprentice program in the early 1970's."
 {¶ 11} Among the information sought, the application form posed three queries to the applicant: (1) "Can you read?" (2) "Can you write?" and (3) "Can you do basic math?" Given a choice of "yes," "no" and "not well," relator selected the "yes" response to all three queries.
 {¶ 12} The PTD application form also asks the applicant to provide information regarding work history. Relator indicated that he was employed as a head custodian for Fairfield City Schools from August 1990 to August 2000. Prior to that, he was employed *Page 5 
as a maintenance repairman/slitter operator for Diebold, Inc., from 1979 to August 1990. Prior to that, he was employed as a machine repairman at a foundry.
 {¶ 13} On the PTD application, five questions were posed to elicit further explanation of the head custodian job. Those five questions and relator's responses are as follows:
 1. Your basic duties: I took care of maintenance of buildings and grounds. (i.e.: grass, rooms, hallways, floors, bathrooms, etc.)
 2. Machines, tools, equipment you used: riding mower, floor buffers, scrubbers, dollies, vacuums, ladders, saws, etc.
 3. Exact operations you performed: general care and maintenance of grounds and buildings, supervising other custodians[.]
 4. Technical knowledge and skills you used: knowledge on how to operate the necessary tools and machinery[.]
 5. Reading / Writing you did: filling out time sheets, maintenance orders, parts and material requests[.]
 {¶ 14} 4. On November 6, 2006, relator was examined by psychologist Lee Howard, Ph.D. In his 17-page narrative report, Dr. Howard opined:
 He has mild depressive symptomatology. He can perform at the simple to moderate task range and can perform at the low to moderate stress range.
 * * *
 The claimant has reached maximum medical improvement. He has had three to four times the amount of treatment normally needed to bring about resolution and/or stabilization of symptomatology and the frequency of depression has decreased by over 50%.
 * * * *Page 6 
 The claimant is capable of sustained remunerative employment. This does not take into account the physical allowances in this claim, unrelated physical conditions, motivational/attitudinal factors, the subjective presentation, and/or some malingering tendencies measured on objective psychometric testing.
 {¶ 15} 5. On February 12, 2007, at the commission's request, relator was examined by Andrew Freeman, M.D. Dr. Freeman examined only for the allowed physical conditions of the industrial claim. In his narrative report, Dr. Freeman opined that relator had a 25 percent whole person impairment for the allowed physical conditions.
 {¶ 16} 6. On February 12, 2007, Dr. Freeman also completed a physical strength rating form. On the form, Dr. Freeman indicated by checkmark that the industrial injury permits sedentary work. For further limitations, Dr. Freeman wrote: "Must be able to stand at least 10 minute[s] per hour."
 {¶ 17} 7. On February 12, 2007, at the commission's request, relator was examined by psychologist Michael A. Murphy, Ph.D. In his narrative report dated February 16, 2007, Dr. Murphy states:
 What is the Injured Worker's occupational activity capacity? In my view, a dysphoric mood may be persistent. However, the Injured Worker is capable of sustained employment due to his depression in this claim. His cognitive and social capacities exhibit mild impairment.
 {¶ 18} 8. On February 16, 2007, Dr. Murphy completed an occupational activity assessment form. On the form, Dr. Murphy indicated by checkmark: "This injured worker is capable of work with the limitation(s) / modification(s) noted below." Below, Dr. Murphy wrote: "Depressed mood requires a low to moderate climate of stress." *Page 7 
 {¶ 19} 9. In support of his PTD application, relator submitted a vocational report prepared by psychologist Jennifer J. Stoeckel, Ph.D., who wrote:
 Summarily, within reasonable psychological and vocational certainty, Mr. Matheny presents as permanently and totally disabled given the combination of his allowed physical and psychological conditions, residual impairment, age of 59 years, lack of transferable work skills, departure from the work force over six years ago, and below average intellectual, academic and vocational functioning as noted per formal testing.
 {¶ 20} 10. Following a May 17, 2007 hearing, a staff hearing officer ("SHO") issued an order denying the PTD application. The SHO explains:
 The injured worker is [a] 59 year old male who has one Workers' Compensation claim. This claim, claim number 00-491833, is predicated upon an industrial accident which occurred on 08/23/2000 when the injured worker slipped on wet pavement while exiting his car and grabbed a car door to break his fall, injuring his low back.
 Dr. Andrew Freeman examined the injured worker on 02/12/2007 at the request of the Industrial Commission. Dr. Freeman examined the injured worker on the allowed physical conditions and concludes that the allowed physical conditions have reached maximum medical improvement.
 Dr. Freeman further concludes that the injured worker retains the functional capacity to perform sedentary employment with the restriction that the injured worker needs to be able to stand for ten minutes each hour. Sedentary employment includes the ability to exert ten pounds of force 1/3 of the time, negligible force 2/3 of the time and sedentary employment is performed while sitting most of the time.
 Dr. Michael Murphy examined the injured worker on 02/12/2007 at the request of the Industrial Commission. Dr. Murphy examined the injured worker on the allowed psychological condition and concludes that the allowed psychological condition has reached maximum medical improvement. *Page 8 
 Dr. Murphy further concludes that the injured worker is capable of engaging in sustained remunerative employment with the restriction that the injured worker's position of employment needs to have low to moderate stress levels.
 Dr. Lee Howard examined the injured worker on 11/06/2006. Dr. Howard examined the injured worker on the allowed psychological condition and Dr. Howard concludes that the allowed psychological condition has reached maximum medical improvement. Dr. Howard further opines that the injured worker retains the functional capacity to perform sustained remunerative employment when the impairment arising out of the allowed psychological condition is considered.
 The Staff Hearing Officer finds that all allowed conditions in this claim have reached maximum medical improvement based upon the reports of Drs. Freeman, Murphy and Howard.
 Based upon the reports of Drs. Freeman, Murphy, and Howard, the Staff Hearing Officer finds that the injured worker retains the functional capacity to perform sustained remunerative employment when the impairments arising out of the allowed conditions are considered.
 Further, when the injured worker's impairments arising out of the allowed conditions are considered in conjunction with the injured worker's non-medical disability factors, the Staff Hearing Officer finds that the injured worker retains the functional capacity to perform sustained remunerative employment and is therefore not permanently totally disabled.
 The Staff Hearing Officer finds that the injured worker's age, 59 years-old, constitutes a mild barrier to re-employment. However, pursuant to State ex rel. Moss v. Industrial Commission
(1996) 75 Ohio St.3d 414, age alone does not constitute an absolute barrier to re-employment. Rather, the injured worker's age must be considered in conjunction with all other relevant factors.
 The Staff Hearing Officer finds that the injured worker has a tenth grade education and has obtained a GED. The Staff Hearing Officer finds that the injured worker's educational history indicates that the injured worker can read, write and *Page 9 
perform basic math skills as would be expected of an individual with the injured worker's level of formal education. Further, a GED certificate ordinarily qualifies the injured worker for semi-skilled to skilled employment. O.A.C. 4121-3-34 (B) (3) (b) (iv). Accordingly, the Staff Hearing Officer finds that the injured worker's educational background constitutes a positive vocational asset which enhances the injured worker's ability to gain re-employment.
 The Staff Hearing Officer finds that the injured worker's IC-2 Application for Permanent Total Disability Compensation indicates that the injured worker has previously been employed as the head custodian at Fairfield Schools and as a maintenance/repair man. The injured worker's duties included supervising four employees, filling maintenance and repair orders, filling out time sheets and ordering parts and materials.
 The Staff Hearing Officer finds that the injured worker's prior work history demonstrates that the injured worker has the transferable work skills, such as the ability to supervise others, read and fill work orders, and order parts and materials, necessary to perform sustained remunerative employment. Accordingly, the Staff Hearing Officer finds that the injured worker's work history constitutes a positive vocational asset which enhances the injured worker's ability to gain re-employment.
 Based on these non-medical disability factors, the Staff Hearing Officer finds that the injured worker has the education, intellect and literacy abilities to perform sustained remunerative employment.
 Further, when the injured worker's non-medical disability factors are considered in conjunction with the injured worker's physical and mental impairments arising out of the allowed conditions, the Staff Hearing Officer finds that the injured worker retains the functional capacity to perform sustained remunerative employment and is therefore not permanently totally disabled.
 Accordingly, the injured worker's IC-2 Application for Permanent Total Disability Compensation, filed 09/27/2006, is denied. *Page 10 
 This order is based on the reports of Dr. Freeman dated 02/12/2007, Dr. Murphy dated 02/12/2007, Dr. Howard dated 11/06/2006 and the non-medical disability factors.
 {¶ 21} 11. On June 29, 2007, the three-member commission mailed an order denying relator's request for reconsideration.
 {¶ 22} 12. On February 28, 2008, relator, Dennis Matheny, filed this mandamus action.
Conclusions of Law:
 {¶ 23} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 24} In State ex rel. Franklin Cty. Bd. of Commrs. v. Indus.Comm., Franklin App. No. 05AP-493, 2006-Ohio-3442, a case cited by relator, the commission awarded PTD compensation based solely upon the medical evidence. The commission explained its reliance upon the report of Dr. Writesel:
 Dr. May states the claimant is permanently and totally disabled as a direct and proximate result of the allowed conditions. While Dr. Writesel does not state this conclusion, he gives physical restrictions due to the bilateral carpal tunnel syndrome that include no repetitive use of the hands and wrists, no forceful use of the hands and wrists, and no lifting, carrying, pushing or pulling. Even sedentary work, as defined in the Dictionary of Occupational Titles, requires lifting up to 10 pounds. In light of this, the physical restrictions given by Dr. Writesel are found to remove the claimant from all sustained remunerative employment. Therefore, Dr. Writesel's report is found to support permanent total disability due solely to the bilateral carpal tunnel syndrome.
Id. at ¶ 27. *Page 11 
 {¶ 25} The Franklin County Board of Commissioners ("Franklin County Commissioners") challenged the commission's award by filing a mandamus action in this court. The Franklin County Commissioners argued that the commission had impermissibly created medical evidence when it relied upon Dr. Writesel's report. Rejecting this argument, this court explained:
 Relator states that it argued before the magistrate that the commission created medical evidence, and that its reliance upon State ex rel. Yellow Freight Sys., Inc. v. Indus. Comm. (1998), 81 Ohio St.3d 56, and State ex rel. Wallace v. Indus. Comm. (1979), 57 Ohio St.2d 55, sufficiently supported its argument. In support of her first objection, relator cites to additional case law in support of the principle that the commission may accept or reject medical evidence, but it may not create it. * * * Although those cases support the principle that the commission cannot "create" medical evidence, they do not prohibit the commission from awarding PTD compensation based solely on an allowed condition even though none of the medical reports specifically state the conclusion that the claimant was permanently and totally disabled solely as a result of that allowed condition.
 In this case, the commission discussed multiple reports in reaching its determination that claimant is entitled to an award of PTD compensation. One of the reports that the commission relied upon was the July 9, 2004 report of Dr. Kenneth A. Writesel. Regarding the SHO's reliance upon that report, relator seems to argue that Dr. Writesel's July 9, 2004 report does not support the awarding of PTD compensation due solely to the bilateral carpal tunnel syndrome. According to relator, the SHO "mischaracterized" Dr. Writesel's report in order to award PTD compensation. We disagree. Dr. Writesel's report states that "[c]onsidering the severe nature of her bilateral carpal tunnel syndrome, [claimant's] job duties would need to be restricted from performing any repetitious or forceful use of both hands and wrists. She should also be limited from lifting, carrying, pushing, or pulling. * * * In my opinion, these restrictions would be considered permanent." The SHO, citing Dr. Writesel's report, stated that claimant's physical restrictions due to the bilateral carpal tunnel syndrome include "no *Page 12 
repetitive use of the hands and wrists, no forceful use of the hands and wrists, and no lifting, carrying, pushing, or pulling." Because Dr. Writesel's statement that claimant should be "limited from lifting" reasonably could be viewed as a finding that claimant should be "restricted from lifting," or that her restrictions include "no lifting," the SHO did not "mischaracterize" the physical restrictions outlined by Dr. Writesel.
 * * *
 Despite the restrictions outlined in his July 9, 2004 report, Dr. Writesel opined that claimant would be capable of engaging in remunerative employment. Here, the commission relied upon the specific restrictions imposed by Dr. Writesel but not his opinion that claimant would be capable of engaging in remunerative employment. The SHO resolved that Dr. Writesel's report supports "permanent total disability due solely to the bilateral carpal tunnel syndrome." Thus, the SHO disagreed with Dr. Writesel's conclusion regarding claimant's ability to work and determined that the physical restrictions outlined by Dr. Writesel "remove the claimant from all sustained remunerative employment." The commission did not abuse its discretion in that regard. As this court has stated, "the commission cannot simply rely on a physician's `bottom line' identification of an exertional category but must base its decision on the specific restrictions imposed by the physician in the body of the report." State ex rel. Owens Corning Fiberglass v. Indus. Comm., Franklin App. No. 03AP-684, 2004-Ohio-3841, at ¶ 56.
Id. at ¶ 5-6, 8.
 {¶ 26} Citing this court's decision in Franklin Cty. Bd. ofCommrs., relator suggests that the case compels this court to conclude that his medical restrictions "are so severe that no jobs are available." (Relator's brief at 10.)
 {¶ 27} In effect, relator invites this court to determine that the medical restrictions contained in the three relied upon reports medically prohibit all sustained remunerative employment even though none of the doctors so opined. *Page 13 
 {¶ 28} If this court were to accept relator's invitation, this court would indeed be creating medical evidence and imposing acceptance thereof upon the commission.
 {¶ 29} It is well-settled that it is the commission that weighs and interprets the medical evidence before it. In the Fr. Cty. Bd. ofCommrs. case, this court followed that well-settled principle of law. This court did not reweigh the medical evidence nor did it reinterpret Dr. Writesel's report. This court determined that the commission did not abuse its discretion in reaching its medical determination.
 {¶ 30} Here, by way of contrast, relator is, in effect, asking this court to reinterpret the medical evidence for the commission and to compel the commission to adopt that reinterpretation.
 {¶ 31} Clearly, relator's reliance upon the Fr. Cty. Bd. ofCommrs. case is misplaced.
 {¶ 32} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1